United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| AUSTIN SNYDER,<br><br>    Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL,<br><br>    Defendant. | Case No. 17-cv-03648-RMI<br><br>**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 14, 21 |

Plaintiff, Mr. Austin Snyder, seeks judicial review of an administrative law judge ("ALJ") decision denying his application for supplemental security income under Title XVI of the Social Security Act. Plaintiff's request for review of the ALJ's unfavorable decision was denied by the Appeals Council, thus, the ALJ's decision is the "final decision" of the Commissioner of Social Security, which this court may review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Both parties have consented to the jurisdiction of a magistrate judge (Docs. 3 & 8), and both parties have moved for summary judgment (Docs. 14 & 21). For the reasons stated below, the court will grant Plaintiff's motion for summary judgment, and will deny Defendant's motion for summary judgment.

## LEGAL STANDARDS

The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A district court has a limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error. *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Sandgathe v. Chater*, 108

F.3d 978, 979 (9th Cir. 1997). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). Additionally, "the ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).

## PROCEDURAL HISTORY

In March 31, 2014, an application for supplemental security income was filed on Plaintiff's behalf, a child under the age of 18, by Plaintiff's grandmother, Ms. Laura Snyder, alleging that Plaintiff had been disable since May 19, 2000, the day of his birth. (Doc. 12, Administrative Record "AR" at 19). The ALJ denied the application on October 1, 2015 (AR at 34), and the Appeals Council denied Plaintiff's request for review on April 24, 2017 (AR at 1-5).

## SUMMARY OF THE RELEVANT EVIDENCE

Plaintiff was born prematurely at approximately 28 weeks (rather than 40 weeks) after an inducted labor, and by emergency C-section delivery. (AR at 315). His mother nearly died during the delivery and she remained in a medically induced coma for several days. (*Id*.). At birth, Plaintiff weighed only 2 lbs., 4 ounces, and spent his first 2 months in the neonatal intensive care unit receiving blood transfusions, during which time he experienced protracted difficulty with breathing, as well as with gaining weight. (*Id*.). As early as the fourth grade, Plaintiff's school psychologist, Dr. Nancy Fitton, tested Plaintiff's cognitive abilities and determined that he suffered from a specific learning disability, thus qualifying Plaintiff for special education courses. (*Id*. at 267).

When Plaintiff was 13 years old and in the 7th grade, a team of evaluators led by his school psychologist, Adrienne Mead, administered a battery of tests and prepared a psycho-educational report. (*Id*. at 266-277). The purpose of the evaluation was to determine Plaintiff's continued eligibility for special education services. (*Id*. at 267). As part of this evaluation, Plaintiff

was administered testing to evaluate him in the areas of cognitive functioning, cognitive ability, psychomotor functioning, auditory processing skills, visual motor integration, social and emotional functioning, as well as in the areas of memory and learning. (*Id*. at 268). In addition to administering diagnostic testing and reviewing records, Plaintiff's family and teachers were interviewed, and Plaintiff was also subjected to classroom observation. (*Id*.).

The first in the battery of the administered tests was the Wechsler Abbreviated Scale of Intelligence ("WASI"). (*Id*. at 269). This is an individually administered, comprehensive clinical instrument for assessing cognitive functioning; the test includes four subsets that test various facets of intelligence, such as verbal knowledge, visual information processing, as well as special and nonverbal reasoning. (*Id*.). Plaintiff performed in the above-average range in the areas requiring naming objects represented by pictures, giving oral definitions of words, finding missing pieces to a matrix or set, and in interpreting and organizing visually perceived material. (*Id*.). Plaintiff performed in the average range in the areas of reproducing designs using colored blocks, matching pictures which are conceptually similar, and verbal knowledge gained from formal and informal education. (*Id*.). Thus, Plaintiff's overall measure of cognitive functioning was determined to be in the average range, yielding a full-scale composite IQ score of 108. (*Id*. at 269-270). Plaintiff also scored in the average range when administered the Beery Developmental Test of Visual-Motor Integration, which measures the amount of coordination between visual perception and finger-hand movements. (*Id*. at 270).

Additionally, Plaintiff was administered the Test of Auditory Processing Skills (3rd Ed.) ("TAPS-3"). (*Id*. at 271-273). The TAPS-3 measures a person's ability to perceive, analyze, synthesize, and discriminate auditory stimuli, including the ability to process and discriminate speech sounds. (*Id*. at 271). Here, Plaintiff scored below average (bottom 5%) in his ability to retain simple sequences of auditory information; he scored deficient (bottom 1%) in his ability to retain simple sentences of auditory information; and, he scored below average (bottom 16%) in his ability to retain details in sentences of increasing length and grammatical complexity. (*Id*. at 271-272). Accordingly, the psychoeducational report concluded that Plaintiff's "working memory scores fell within the deficient range and below average range." (*Id*. at 273).

3

In the area of social-emotional functioning, Plaintiff was administered the Conners Rating Scales (3rd Ed.) ("Conners-III"). The Conners-III is a set of scales used to gather information about the behaviors of children and adolescents in relation to symptoms of ADHD and other comorbid disorders. (*Id*. at 273). Here, Plaintiff's scores indicated "very elevated" concerns in relation to learning problems and executive functioning – specifically, it was reported that Plaintiff struggles with reading, spelling, mathematics, and that he experiences difficulty remembering concepts. (*Id*.). Plaintiff was also found to be in the "very elevated" range for problems with inattention, hyperactivity, impulsivity, learning problems, defiance, aggression, and peer relations. (*Id*. at 275). The concluding assessment of the psychoeducational report was that Plaintiff has manifested "a severe discrepancy between achievement and cognitive ability," and that Plaintiff "demonstrates a disorder in the [] basic psychological processes [of] attention and auditory processing." (*Id*.). Thus, it was reported that Plaintiff suffered from a specific learning disability due to his limitations in the areas of attention and auditory processing, and that "[t]hese characteristics adversely affect [his] educational performance," and for which Plaintiff "needs Special Education assistance." (*Id*.). The evaluation team then set forth detailed recommendations to help deal with Plaintiff's processing and attention deficits, as well as his other learning disabilities. (*Id*. at 276-277).

Plaintiff's treating psychiatrist, Marina Zelenko, M.D., referred Plaintiff for evaluation at the Autism Spectrum Disorders Center at the Kaiser Permanente San Jose Medical Center. (*Id*. at 314-331). On June 14, 2014, Plaintiff was evaluated by Thomas Crawford, Ph.D., a clinical psychologist. (*Id*. at 314). Dr. Crawford's report noted that Dr. Zelenko had referred Plaintiff due to concerns with social and communication difficulties, behavioral problems, and, notably, Plaintiff's "academic or learning problems." (*Id*.). Therein, Dr. Crawford reviewed the entirety of Plaintiff's educational and medical records and noted that Plaintiff "has documented evidence of a learning disability," that "he obtained very low scores (around or below the 1st percentile) on multiple tests involving reading and writing," and that his special education teachers had noted that Plaintiff was "far below grade" (even with special education assistance) in reading and math. (*Id*. at 316). Dr. Crawford administered the Adaptive Behavior Assessment System (2nd Ed.)

4

("ABAS-II"). (*Id*. at 324). The ABAS-II measures the functional stills of individuals from birth to adulthood in the areas necessary for daily living, focusing on what individuals can do without help from others and whether they do those tasks when necessary. (*Id*.). In this regard, Dr. Crawford assessed Plaintiff to function in the "extremely low" range (below 1%). Specifically, Dr. Crawford determined that Plaintiff functions in the extremely low range in the following areas: communication, functional academics, home living, health and safety, leisure, self-care, self-direction, and social interactions. (*Id*.). As to his learning disorder, Dr. Crawford opined that Plaintiff, "despite scoring well on [the] measure of cognitive/intellectual ability, has long displayed significant deficits in his reading, writing, and math skills," and that Plaintiff's "learning challenges make his world <u>far</u> more difficult for him to manage, most especially when he also has to struggle with having ADHD, emotional problems, and multiple life problems." (*Id*. at 326). Dr. Crawford added that these "difficulties put him at risk for developing more stress, depression and anxiety as he gets older." (*Id*.). Dr. Crawford's assessment of Plaintiff's overall mental condition was that Plaintiff suffered from the following disorders: (1) ADHD-combined type; (2) Anxiety Disorder, Not Otherwise Specified; (3) Learning Disorder, Not Otherwise Specified; and (4) Oppositional Defiant Disorder. (*Id*. at 326-327). Thereafter, Dr. Crawford's report reflects a detailed series of recommendations and care-plan. (*Id*. at 327-332). Additionally, the record is rife with consistent academic assessments from Plaintiff's teachers through his various grades of school. For example, when Plaintiff was in the 9th grade, even with special education assistance, Plaintiff's reading and math levels were at a 6th grade level, and that his writing was at a 5th grade level. (*Id*. at 514).

The record also contains the opinions of non-treating non-examining consultative reviews by state agency physicians. The first of which, Preston Davis, Psy.D., found that while Plaintiff "has a learning disability in the area of reading and comprehension," and that while his "condition does limit his ability to learn and function in school . . . careful review of all evidence does not show that his condition is as severe as required by Social Security regulations for disabled child's benefits." (*Id*. at 76-78). A second state agency consultative reviewer, Barbara Moura, Psy.D., expressly categorized Plaintiff's learning disorder as "severe." (*Id*. at 86-87) ("The child's

5

medically determinable impairment or combination of impairments is severe, but does not meet, medically equal, or functionally equal the listings . . .").

At the hearing, the ALJ also heard testimony from David B. Peterson, Ph.D., who was then employed as a medical expert for the Social Security Administration. (*Id*. at 508). The ALJ's first question for Dr. Peterson was whether he considered Plaintiff's conditions to meet or equal a listing, having reviewed Plaintiff's "chart." (*Id*. at 52). Dr. Peterson responded in the negative, noting that Plaintiff's ADHD condition was attended with treatment notes that "suggest that the condition was stable with no negative side effects from the medication." (*Id*.). As to Plaintiff's learning disorder, Dr. Peterson added that he was not aware of the type of learning disorder, and surmised that it may be related to Plaintiff's anxiety. (*Id*. at 53). When asked whether difficulties with spelling, oral fluency, word reading and pseudo word decoding would not evidence a learning disability, Dr. Peterson responded that "[w]hat we would need to see is that over the long term that these difficulties persisted, and then based on both sets of tests we would expect to see somewhere [sic] learning disorder of reading and/or written expression." (*Id*. at 55). Later, Dr. Peterson clarified that his assessment of Plaintiff's learning disability was that, at Step Three, it did not meet or equal a listing. (*Id*. at 56-59). Notably, Dr. Peterson did not opine as to whether Plaintiff's learning disability was or was not severe under Step Two. (*see id*. at 52-59).

**THREE-STEP SEQUENTIAL ANALYSIS FOR CHILDHOOD DISABILITY**

SSI is available under Title XVI of the Social Security Act when an eligible claimant's income and resources do not exceed statutory maximums and the claimant is "aged, blind, or disabled" within the meaning of the statute. 42 U.S.C. § 1382(a). "An individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).

ALJ's apply a three-step sequential evaluation process to determine whether a claimant under the age of eighteen is disabled. 20 C.F.R. 416.924(a). At step one, the ALJ must determine whether the claimant is performing "substantial gainful activity." *Id*. If not, the analysis proceeds

to step two. *Id*. At step two, the ALJ must determine whether the claimant suffers from one or more impairments that are severe. *Id*. If so, the analysis proceeds to step three. *Id*. At step three, the ALJ determines whether the claimant's impairment or combination of impairments meet or, medically or functionally, equal an impairment in the Listings. *Id*. If not, the claimant is not disabled; if so, and if the impairment or combination of impairments meets the duration requirement, the claimant is found to be disabled. *Id*.

Here, the ALJ evaluated Plaintiff's application for benefits under the required three-step sequential evaluation. (*See* AR at 19-34). At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his application date. (AR at 22). At Step two, the claimant bears the burden of showing that he has a medically severe impairment or combination of impairments. *See* 20 C.F.R. § 416.920(a)(4)(ii), (c). "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting S.S.R. No. 96–3(p) (1996)). The ALJ found that Plaintiff suffered from the following severe impairments: attention deficit hyperactivity disorder, combined type; anxiety disorder, not otherwise specified; and oppositional defiant disorder. (AR at 22). At Step Three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met, or medically or functionally equaled, one of the listed impairments. (AR at 22-34).

**ISSUES PRESENTED**

Plaintiff presents the following issues: whether the ALJ erred at Step Two by finding Plaintiff's learning disorder to be non-severe; whether the ALJ erred by rejecting medical evidence without providing legitimate reasons supported by substantial evidence; whether the ALJ provided germane reasons for discrediting lay witness testimony; and whether the ALJ's finding of non-disability at Step Three was erroneous.

**DISCUSSION**

Plaintiff contends that the ALJ erred at Step Two by determining that Plaintiff's learning disability was non-severe. As stated above, following the sequential evaluation process, after making a Step Two determination about the medical severity of one or more impairments, the ALJ

7

proceeds to Step Three where the claimant's impairments are compared to those in the Listing. Because the court finds error at Step Two, warranting remand for further proceedings, the court does not find it necessary to address Plaintiff's arguments pertaining to the ALJ's Step Three analysis.

The portion of the ALJ decision that ventured to explain why Plaintiff's learning disability is not severe is confusing and unclear. (*See* AR at 22). The ALJ's explanation begins with the statement that "[t]here is objective evidence in the medical record that the claimant has been evaluated and treated for a learning disorder . . . [h]owever, there was no testing to support what type of learning disorder the claimant possessed." (*Id*.). The ALJ then stated that "[t]here was no objective testing available in the record . . . [and that] no aggressive treatment was recommended or anticipated for this condition." (*Id*.). This was the entirety of the basis on which the ALJ concluded that Plaintiff's learning disability is non-severe at Step Two.

Plaintiff argues that the ALJ's Step Two finding as to his learning disability was premised on the application of an incorrect legal standard, as well as being based on certain factual errors. (Doc. 14 at 11). Plaintiff submits that the ALJ's focus on the notion that Plaintiff's learning disability had not been narrowed down to a particular *type* of learning disability subjected Plaintiff to a more stringent standard of proof than what is required by the law; that the ALJ erred in finding that there was no objective testing performed, as such tests and their results were part of the record; and, that the ALJ failed to explain "what kind of "aggressive treatment" would be expected for a learning disorder other than tutoring, special education qualification and services and additional accommodations and supports at school, all [of] which Mr. Snyder was receiving." (*Id*. at 12). Plaintiff also argues that it was error for the ALJ to fail to even address the opinions of Plaintiff's school psychologist, Arianne Mead, and of Plaintiff's examining psychologist, Dr. Crawford. (*Id*. at 16). Thus, Plaintiff submits that the ALJ disregarded these opinions without any analysis or justification whatsoever. (*Id*.).

Defendant responds to the effect that the record in fact did not manifest any "objective tests identifying exactly what type of learning disorder Plaintiff supposedly had." (Doc. 21 at 4). Defendant adds that the SSA medical expert, Dr. Peterson, testified that "Plaintiff had no

8

definitive learning disorder." (*Id*.). Defendant also argues that the ALJ was correct in finding that "the record did not reveal any aggressive treatment for such condition." (*Id*. at 4-5). Defendant suggests that Plaintiff was, at worst, afflicted with "learning difficulties or problems rather than a disorder," and basically, "that he has difficulty reading." (*Id*. at 5). As to Plaintiff's argument that the ALJ failed to even mention, let alone address, the opinion of Plaintiff's examining psychologist, Dr. Crawford, Defendant's pleading likewise makes no mention or argument in this regard whatsoever. (*See generally* Def.'s Mot., Doc. 21).

The court finds Defendant's arguments to be unpersuasive. As an initial matter, Defendant incorrectly characterizes Dr. Peterson's testimony. Dr. Peterson never stated that Plaintiff has no learning disorder. Instead, Dr. Peterson merely opined that he could not conclude that Plaintiff's learning disorder met or equaled a listing. Dr. Peterson was never asked, and neither did he venture to opine without being asked, whether Plaintiff's learning disability was severe at Step Two.

In any event, the ALJ committed dual errors in basing a conclusion that Plaintiff's learning disorder was not severe at Step Two on the notion that the record did not reveal the specific type of learning disorder. One facet of this error is manifest in the fact that the ALJ found another of Plaintiff's type-unspecified conditions to be severe at Step Two, namely, Plaintiff's anxiety disorder, not otherwise specified. (AR at 22). This is so because there is no legal requirement under Step Two that would govern a finding as to the severity of a medically determinable impairment based on type or sub-type specification.

Instead, the governing standard is that "[a]n impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.' S.S.R. No. 96–3(p) (1996)." *Webb*, 433 F.3d at 686. Consequently, "the step-two inquiry is a *de minimis* screening device [used] to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996)); *see also Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (noting the step-two inquiry is intended to identify "claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled"); *Ortiz v. Comm'r of Soc. Sec.*, 425 F. App'x 653, 655 (9th Cir. 2011) ("Ample authority cautions

against a determination of nondisability at step two."). Further, because step two is a de minimis screening device, "an ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when his conclusion is 'clearly established by medical evidence.'" *Webb*, 433 F.3d at 687 (quoting SSR 85-28).

The other facet of the ALJ's erroneous conclusion in this regard is that the specific type of Plaintiff's learning disability *was* identified in the record. As discussed in detail above, Plaintiff's psychoeducational report concluded, following a battery of diagnostic testing, that Plaintiff suffered from a "specific learning disability" due to his limitations in the areas of attention and auditory processing, and that "[t]hese characteristics adversely affect [his] educational performance," and for which Plaintiff "needs Special Education assistance." (AR at 275). Thus, the "type" of learning disability was one involving the faculties of auditory processing and attention. Thus, the ALJ erred in concluding that "there was no testing to support what type of learning disorder the claimant possessed." (AR at 22).

Additionally, the ALJ erroneously concluded that "there was no objective testing available in the record." (*Id*.). As discussed above, Plaintiff was tested extensively by his school psychologist, Arianne Mead, and by Dr. Crawford. The results of those tests demonstrate a difference between Plaintiff's cognitive abilities and his performance, resulting in the opinion evidence that Plaintiff suffered from a specific learning disability due to his limitations in the areas of attention and auditory processing, and that "[t]hese characteristics adversely affect [his] educational performance," and for which he "needs Special Education assistance." (*Id*. at 275). The evaluation team led by Ms. Mead then set forth a series of detailed recommendations to help deal with Plaintiff's processing and attention deficits, as well as his other learning disabilities. (*Id*. at 276-277). Further, Dr. Crawford assessed Plaintiff to function in the "extremely low" range (below 1%), in the areas of communication, functional academics, home living, health and safety, leisure, self-care, self-direction, and social interactions. (*Id*.). As to his learning disorder, Dr. Crawford opined that Plaintiff, "despite scoring well on [the] measure of cognitive/intellectual ability, has long displayed significant deficits in his reading, writing, and math skills," and that these "learning challenges make his world far more difficult for him to manage, most especially

10

when he also has to struggle with having ADHD, emotional problems, and multiple life problems." (*Id*. at 326). Dr. Crawford added that Plaintiff's learning disability presents a risk of aggravating his depression and anxiety, particularly as as he gets older. (*Id*.).

The court finds that the ALJ erred in simply ignoring Dr. Crawford's opinion, and that the ALJ likewise erred by overlooking or disregarding the psychoeducational testing and report undertaken by Plaintiff's school psychologist, Ms. Arianne Meade. On remand, the Commissioner is instructed to carefully consider these opinions and to either accept or reject them in accordance with the relevant legal standards for doing so. Furthermore, while the ALJ's opinion claimed (AR at 28) that significant weight had been afforded to the opinions of the non-examining state agency consultants, Drs. Davis and Moura, it appears that the ALJ misapprehended the consultants' opinions. Dr. Davis found that while Plaintiff "has a learning disability in the area of reading and comprehension," and while his "condition does limit his ability to learn and function in school," the condition itself does not warrant payment of disabled child's benefits. (*Id*. at 76-78). Dr. Moura expressly categorized Plaintiff's learning disorder as "severe." (*Id*. at 86-87). Thus, it is unclear how the ALJ could have afforded these opinions "significant weight" while also finding Plaintiff's disability to be non-severe at Step Two.

Lastly, because Dr. Crawford opined that Plaintiff's learning disability has the effect of aggravating his anxiety and depression, and because the ALJ made no mention whatsoever of Dr. Crawford's opinion, it can not be argued that the ALJ's error at Step Two was harmless – especially in light of the fact that Step Three involves the evaluation of medical and functional equivalency of Plaintiff's impairments to the listings. While the ALJ's decision included a statement to the effect that even Plaintiff's non-severe impairments were considered in determining his residual functioning capacity (AR at 22), that statement appears to be boilerplate in that a review of the ALJ's decision does not reveal that Plaintiff's learning disability (as detailed in the medical opinions that the ALJ ignored) were factored into the Step Three analysis.

The court finds, therefore, that it cannot resolve the additional issues raised by Plaintiff until the error in the ALJ's Step Two analysis is corrected. *See Haverlock v. Colvin*, No. 2:12-CV-2393-DAD, 2014 WL 670202, at *5 (E.D. Cal. Feb. 20, 2014) ("In light of the remand

11

required by the ALJ's error at Step Two, the court need not address plaintiff's remaining claims."). Accordingly, the case must be remanded for further proceedings consistent with the opinions expressed herein.

## CONCLUSION

For the reasons stated above, the court GRANTS Plaintiff's motion for summary judgment, DENIES Defendant's motion for summary judgment, and REMANDS this matter for further proceedings in accordance with this Order.

A separate judgment will issue.

**IT IS SO ORDERED.**

Dated: September 18, 2018.

ROBERT M. ILLMAN
United States Magistrate Judge